Filed 7/27/26  R.C. v. C.C. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| R.C.,<br><br>        Appellant,<br><br>        v.<br><br>C.C.,<br><br>        Respondent. | B338856<br><br>(Los Angeles County<br>Super. Ct. No.<br>23STPT03066) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark Juhas, Judge.  Affirmed.

Gabbard Family Law and Nathan W. Gabbard for Appellant.

James Alex Karagianides for Respondent.

At the request of respondent C.C. (Mother), the family court issued a domestic violence restraining order against appellant R.C. (Father), with whom she shares a son, B.C. (Son). The parties protected by the restraining order the court issued are Mother, Son, and their nanny, C.S. (Nanny).  Father asks us to decide whether the court should have granted Father's requests to continue the evidentiary hearing held to decide whether the restraining order should issue, whether the court improperly shifted the burden of proof to him at that hearing, and whether the family court's overall decision to grant the requested order was an abuse of discretion.

## I.  BACKGROUND

### A.  *Commencement of Family Law Proceedings and Mother's Request for a Temporary Restraining Order*

Mother and Father were never married.  Father initiated family law proceedings in October 2023 when he filed a petition to determine his parental relationship with Son.

Shortly thereafter, Mother filed a request that the court issue a domestic violence restraining order protecting her, Son, and Nanny from Father.  Mother's supporting declaration asserted Father had long been abusive to her and Son but his abuse recently escalated to a point where Mother no longer felt safe living with Father or allowing Son to live with him.  The declaration described a slew of incidents that Mother believed to be abusive, e.g., a time when Father berated Son over the quality of his homework and Son hit himself and said he was stupid and not good enough, times when Father screamed or threw things at Mother, and times when Mother claimed Father sexually assaulted her.

2

The same day that Mother filed her request, the court issued a temporary restraining order that limited Father's contact with Mother, Son, and Nanny; that temporarily gave Mother sole custody of Son; and that ordered Father not to visit Son. The court also set a hearing on November 9, 2023, to decide whether a restraining order should issue on a more permanent basis.

### B. Pre-Hearing Proceedings
#### 1. Father's first request for continuance

On November 8, 2023, Father filed a request to continue the restraining order hearing to give him additional time to prepare a defense in light of the seriousness of Mother's accusations and the length of time over which she alleged the abuse occurred. He also asked the court to modify the temporary restraining order to allow him monitored visitation with Son.

The family court designated the case a long cause matter and continued the hearing for reassignment.[1] After reassignment, the court held a trial setting conference in late November 2023 and reserved dates in late February and early March 2024 for the evidentiary hearing.

---

[1] The court ordered Father and Son to participate in conjoint therapy once Son's therapist confirmed he was ready for it. The court also ordered that, pending confirmation from Son's therapist, Son and Father were to have recorded video calls twice per week. The temporary restraining order was amended in December 2023, and the amended order provided Father with two phone calls per week only.

## 2. *Father's second request for continuance*

The trial court held a status conference at the end of January 2024.  There is no reporter's transcript of the proceedings, but a minute order indicates the court set various pretrial deadlines (including dates to exchange video exhibits, witness lists, and exhibit lists) and left the evidentiary hearing in place as scheduled.

Approximately one week later, Father filed an ex parte application to continue the trial date for at least 60 days.  A declaration from counsel supporting the application explained various witness depositions (including those of Mother, Father, and Nanny) had been started but not completed and represented Father needed additional time to complete them.  Counsel also identified several other discovery-related bases for the requested continuance: Father's need to depose out-of-state witnesses, Mother's production of 22 video files that needed transcription and metadata investigation, Father's need to translate 314 pages of text messages produced by Nanny, Mother's pending motion to quash a subpoena Father issued to a third party, and Mother's asserted failure to produce documents necessary for trial.[2]  Father argued Mother would not be prejudiced by a continuance because Father would agree to extending the terms of the temporary restraining order pending new trial dates.

Mother opposed Father's request for a continuance, citing then-newly effective Family Code section 6309, which provides for special procedures to "streamlin[e] any domestic violence restraining order discovery to expedite the adjudication of

---

[2]     Many of the requests for production sought documents related to Mother's finances.

4

requests for restraining orders and prevent abusive litigation tactics that interfere with legislative intent to protect domestic violence victims." (Fam. Code,[3] § 6309, subd. (a)(2)(C).) Mother argued that, in light of section 6309, Father wrongly assumed he was entitled to conduct and complete all discovery he deemed necessary prior to the hearing. Mother also argued Father failed to seek a continuance as soon as reasonably practicable, and that granting his request would prejudice Mother by subjecting her to further abuse via discovery.

The family court denied Father's requested continuance. The court explained: "In light of Family Code section 6309, an ex-parte requesting discovery is not appropriate."

### 3. *Father's third request for continuance*

Just over two weeks later, Father filed another ex parte application to continue the trial. At that point, Father had retained new counsel and counsel submitted a declaration outlining several reasons for the requested continuance: (1) he had been retained to file a competing request for a domestic violence restraining order against Mother and it would make more sense to hear the matters together, (2) Father's initial attorney was anticipating withdrawing due to family issues, (3) Mother provided "'discovery dumps'" after the court's earlier denial of his request for a continuance that required forensic expert review,[4] (4) some of the videos Mother produced were

---

[3] Undesignated statutory references that follow are to the Family Code.

[4] Specifically, the declaration states that on February 9, 2024, Mother produced 13 new videos, two new photographs, and

5

stripped of metadata and would require production of the originals, and (5) Father needed time to file a request for the original video footage and a motion in limine to preclude the use of videos until the versions produced could be compared with the original footage.

Mother opposed the ex parte application, arguing Father was seeking to use excessive discovery and litigation to continue to harass Mother.  She again argued Father could not establish good cause for a continuance and had not sought a continuance as soon as reasonably practicable.

The trial court denied the requested continuance.  In its minute order, the court stated the hearing dates had been set for almost 90 days and the temporary restraining order had been in place for four months.  The court noted it was Father's second continuance request that month, this time with new counsel.  The court opined both parties were entitled to resolution of the domestic violence issues between them and the court's review of the papers indicated there was not good cause to continue the matter so close to the scheduled evidentiary hearing date.

### 4.    *Mother's motions in limine*

After Father filed an amended witness list in advance of the restraining order evidentiary hearing date, Mother filed two

---

22 videos that were previously produced without metadata.  On February 15, 2024, Mother produced three new photographs and five new PDF files, at least one of which consisted of 125 pages of text messages.  The declaration did not specify how long any of the videos were.

motions in limine.[5] One asked the court to preclude Father from calling trial witnesses and the other asked the court to preclude Father from introducing any exhibits at trial. Both motions were premised on Father's failure to timely file witness and exhibit lists by the court's previously set deadline and his failure to comply with relevant local rules. Counsel for Mother submitted a declaration asserting she communicated with Father's counsel the day after the deadline to submit an exhibit list and counsel informed her they would not be submitting an exhibit list.

The motions in limine were argued on the first day of the restraining order hearing. Though there is a reporter's transcript from that day, the motions in limine were not argued on the record. Rather, toward the beginning of the hearing, the court stated: "The record should reflect that we had a discussion about exhibits. [¶] [Father] is going to have no exhibits in [his] case-in-chief. The only exhibits [he] will have will be impeachment exhibits. [¶] [Father] has two witness lists. [¶] [Father] advised that the expert witness that is on the new list will be only for impeachment; [¶] and that any witness that is not on the initial list will be precluded from testifying."

The record also contains a minute order memorializing the ruling on Mother's motions in limine. The minute order states the court granted Mother's motion in limine to exclude Father's trial exhibits and granted in part Mother's motion in limine to exclude Father's witnesses—such that Father could only present witnesses who were on his initial witness list or who would be called for impeachment purposes. The minute order additionally

---

[5] No written opposition to the motions in limine is included in the appellate record.

explains that Father "advise[d]" that the expert listed on his amended witness list would testify for impeachment purposes only and any exhibits to be offered would likewise be offered only for impeachment.

### C.    The Evidentiary Hearing

Mother, Father, and Nanny testified during the evidentiary hearing.  So did Shari Dinnel (Dinnel), Son's reading tutor for a period of time; Mohammad Siddiqui (Siddiqui), Father's brother-in-law; and Rob Levy (Levy), Father and Mother's friend.

The testimony at the hearing established a timeline of sorts for Mother and Father's relationship.  They met in Philadelphia in January 2012 and moved to California together in 2015. Mother planned to leave the relationship in 2016, but she became pregnant and decided to stay with Father.  Son was born in December of that year and Mother informed Father she was going to leave the relationship in 2017 or 2018, but she ultimately reconsidered.  In January 2019, Mother and Father hired Nanny to be their live-in nanny.  Mother again told Father she was going to leave the relationship in 2020, but again, she ultimately reconsidered.  In May or June of 2020, and in May of 2021, Mother underwent IVF treatments in hopes of having a second child.  Mother and Father ended their romantic relationship in February 2023 but they continued to live in a house in Encino together until October 2023—when Mother left the home with Son.

> 1. *Father's behavior, as described by Mother and Nanny*
>> a. *Father's concern for his possessions*

When Mother and Father moved to California together in 2015, Father refused to hire movers because he did not want anyone to touch or break his belongings. Once in California, Father did not want Mother to have visitors at their home because he did not want them to touch his belongings. If Mother moved any of Father's artwork, Father would scream at her and tell her not to do so. Father would get very angry when Nanny touched his clothes or certain tools he used for his art. Once, when she touched some tools, he got very upset, waved a knife, and said he would chop off Nanny's hand if she ever touched it again. Mother also recounted four incidents in late 2022 in which Son knocked into or otherwise hit some artwork piled or stacked around the home and Father screamed at him.

Father placed video cameras in many places in the various homes Mother and Father shared, including Mother and Father's bedroom. After they moved to Encino in September 2022, Mother had no access to the security cameras in the home.

On the day of Son's first birthday party in December 2017, Mother moved boxes of light bulbs Father had left out in the living space. When Father realized this, he confronted Mother in the nursery while she was changing Son's diaper. Mother submitted a video of the incident, captured on a camera in the nursery. In the video, Father walks into the room, stops near the doorway, and says, "I spent fucking hours on these lights." Mother tells Father to "start over," waving her hand at him. Father turns back toward the door, says, "no, fuck you," calls

9

Mother a "piece of shit," and throws a handful of mail in Mother's direction before walking away. Mother yells back at Father to get out of the house.

### b. Father's treatment of Mother

When Mother and Father disagreed about something, Father would say Mother was not as educated as he was, was not as smart as he was, and could not make decisions as well as he could. When Mother did not acquiesce to something Father wanted, he would tell her she was stupid and her family was uneducated white trash.

Father once put his arm around Mother's neck to restrain her during an argument, hindering her breathing for approximately two minutes. During a different argument, which occurred while Mother was pregnant, Mother retreated to take a shower and Father proceeded to bang on the shower door and yell at Mother for approximately three minutes while Mother was in the corner facing away from him and sobbing.

In 2018, Father pressured Mother to have sex with him on a daily basis. There were times Mother relented to Father's demands. There were also times she declined to have sex with Father and he would spend an hour insulting her and telling her she was not a good partner and was not meeting his needs. On other occasions, Father would persist after Mother refused to have sex and she would just lay there and let him have his way with her. One night in August 2020, while Mother was undergoing IVF treatments and was not permitted to have anything inserted into her vagina, Father pinned her down by putting his knees on her shoulders after she said "'no'" and then thrust his penis into her mouth repeatedly until he orgasmed.

In July 2023, which was after Mother and Father had ended their romantic relationship, Father was caring for Mother because she was injured on a business trip. While Mother was still recovering, Father began to pressure Mother for sex. He repeatedly told Mother that masturbating would help relieve her pain and purported to show her a research paper on the topic. Mother told him she was in pain and not feeling sexual. Later, on an evening in August, Mother fell asleep in bed (she and Father were sharing a bed) and awoke to find Father rubbing his erect penis against her, with his fingers in her vagina. Mother told him to stop and pushed his arm away. Father tried to put his fingers back in Mother's vagina, saying she would feel better. After Mother pushed him away and said no several times, he stopped.

Mother later sent Father a text message stating that in order to avoid a repeat of the previous night, Mother wanted to be clear she did not want to be touched in any sexual way. Father responded he did not want to repeat it either, saying he did not want to be "set up." Father also reminded Mother that he had paused his life for three weeks to take care of her following her accident. Father indicated that when he went to bed the night before, Mother engaged with him verbally and physically rubbed all over him, "to which [he] reciprocated." Father reiterated that he did not want to be set up or spoken to poorly.

### c. *Father's treatment of Son and focus on Son's education*

Father intimidated and screamed at Son. At times, Father would also try to take Son into the bathroom, and Mother would step between them, say no, and try to interact with Father such

11

that he would start yelling at her instead. Father would sometimes threaten to lock Son in the dark garage; the cold, dark pool; or a closet without the lights on. He did so on New Year's Eve 2022, and Son ran into a different room to stay away from Father.

Father was very fixated on Son's education. Mother submitted a video, captured by a camera in Son's bedroom, of an incident that took place when Son was three and a half years old. In the video, Father and Son are sitting together looking at a piece of paper. Father tells Son to do something "right now" or he would get in trouble. Son responds that he doesn't know how to do it. Father says he does, and instructs him to try. Son appears to try and looks back at Father. Father gets up and leads him out of the room. Son asks, "What's going to happen to me?" Father says something that sounds like, "What do you think?" Son says, "spank?" and Father says, "I don't know, maybe." Son later told Mother that Father spanked him. Nanny testified she saw Father hit Son several times when they were living in Redondo Beach, and once when they were living in Encino.

In 2021, Mother and Father initially enrolled Son in a private school close to their home in Redondo Beach. Before the school year started, Father spoke to a different private school in Sherman Oaks without informing Mother, filled out an application without her knowledge, and informed her one morning they had an interview with the school the same day. Son ultimately attended the school in Sherman Oaks, and before he started, Mother, Father, and Son moved to Encino (which was not what Mother wanted).

Son started first grade in fall 2023. Father was angry Son's first homework assignment included words that were spelled

wrong. On October 12, 2023, Father took issue with how Son completed a different homework assignment. Mother and Father proceeded to argue at the dinner table, with Son sitting between them eating his dinner, about whether the way Son completed the homework was sufficient. Mother presented 10 video clips of the argument, which she took on her cell phone. Father asked Son if he wanted to finish his homework, while Mother spoke over him and said Son had finished the homework just right. Father said Mother had sub-par schooling. Father also told Son that Son was smarter than Mother and tested higher than Mother. Father threatened Mother that if she continued on this path she would lose custody of Son.

After the incident, Son told Mother he just does what Father says so Father does not get "more mad." Later the same night, Son was very agitated and started flinging his body down on the bed. When Mother tried to calm him down, he started hitting himself and scratching his face. Son said he hated himself, and did not want to be on this earth. Mother presented a video of part of the incident, in which Son said he is stupid and an idiot and said he is going to kill or hit himself.

Mother left the family home with Son the next day. Father subsequently demanded Nanny disclose their location. Paternal grandmother asked Nanny if she loves living in America and said she (the grandmother) could "make one phone call." Nanny also said both paternal grandmother and Father threatened her immigration status. At some point, Father also told Nanny he would take her to Tijuana and said he had friends in gangs and in the mafia there.

### 2. *Father's testimony*

Father did not deny Mother's request to use a moving company when they moved to California. Mother also had access to all the video cameras in their homes in Redondo Beach and Encino.

Regarding the December 2017 incident involving lightbulbs, Father did not intentionally throw mail at Mother. Instead, he meant to put the mail down on an ottoman or chair but the mail was heavier than he realized. Father also did not assault or strangle Mother during any argument.

Father did not engage in any sexual conduct with Mother when she was asleep and he never did anything sexual to Mother without her consent. Regarding the allegation of sexual assault in August 2023, Mother and Father were laying in bed when Mother asked why Father was not cuddling with her. Father started cuddling with her, she was moving around a little bit, and then she asked Father to rub her back. He massaged her from her neck to her glutes, and she suddenly asked what he was doing. Father said he was just massaging her, and Mother said she didn't want him to do it that way. Father did not do anything without Mother's consent that night.

Father never spanked Son, and never wanted to spank him, but there were a couple of instances where he tapped Son on his bottom over his pull-ups and pants. He said Son thought it was funny. Father never put Son in the garage; a cold, dark pool; or a dark closet. Father also did not threaten Son on New Year's Eve 2022. Father had no issue with Son touching his possessions or his art. He did, however, take issue with Son jumping on the couch at times.

14

Regarding Mother's education, she told Father on numerous occasions that she had to get herself ready for school in the morning and had some gaps in her early learning and homework because she did not have the support she wanted to have. Some of those gaps were "obvious" to Father, and though she had done the best she could to help Son with his schoolwork, some of what Son was learning was detrimental. As an example, Son was drawing his letters the wrong way and had to spend four months with a reading specialist to unlearn it.

The video of the October 2023 interaction with Son (and Mother) about Son's homework was missing segments, including two or three minutes in the beginning in which Mother insulted Father. Son told Mother he wanted to add to his homework, but Mother told him the homework was done. Both Father and Mother said many things in the course of that interaction that were not appropriate to say in front of Son.

The knife-brandishing incident involving Nanny never occurred. Father has never brandished a knife at anyone.

Mother sent Father, during their relationship, a "constant barrage of emails"; of 2,760 emails Father reviewed, Mother started the vast majority of the arguments in those emails. Father believed he was being "baited"; he would think they had a great time and then receive an email purporting to document something that didn't happen. Father also reviewed 2,400 pages of text messages that revealed the consistency of his relationship with Mother. Father also had video footage of Mother pinching Son, flicking him in the head, and screaming at him. When this occurred, Father would confront Mother about the behavior, she would deny it, and Father "would pull the video and show her."

On cross-examination, Father was asked to confirm he did not produce in discovery the 2,760 emails he described in his testimony.  Father said he did not know, replying that there was a "mass" of discovery produced.  Father also did not know if he had produced in discovery the 2,400 pages of text messages he referenced.  Likewise, Father was also asked to confirm he had not produced any videos of Mother pinching and flicking Son.  He responded, "I don't believe so.  I don't know.  I don't believe so."

Since the issuance of the temporary restraining order, Father had been in therapy and taken parenting classes.  Father had a few phone calls per week with Son since December.  During one call, Son told Father he did not like it when Father yelled at him.  Father asked when he yelled at Son, and Son did not give specific examples.

### 3. *Additional witnesses called by Father*

According to Dinnel, Son never expressed any fear of Father and she never witnessed Father being inappropriate with Son or abusive to Mother.  According to Siddiqui, he never observed Mother or Son to be afraid of Father.  According to Levy, Mother never appeared afraid of, controlled by, or subservient to Father.  Levy also never observed Father physically abusing Son and Levy had no reason to believe Father was verbally abusive.

### D. *The Trial Court Issues a Domestic Violence Restraining Order*

The family court took the matter under submission and made its ruling in a March 7, 2024, minute order setting forth "further findings and comments [that were intended] to be read

in conjunction with" the various "comments and findings" the court earlier made on the record. Those comments and findings were made after the close of testimony and partially in preparation for the parties' closing arguments. Among other things, the court commented that Father's statement that he has voluminous texts, emails, and videos that would prove Mother wrong could lead the court to believe Father was not telling the truth because he did not present any of it. The court also stated there was pretty good evidence that the sexual assault incident Mother described as happening after her accident occurred the way she said it did, but the court said it was not making an express finding at that time.

As reflected in the minute order, the family court expressly found Mother was more credible than Father about the various events. The court specifically highlighted in that regard the difference between Father's description of the "mail video" incident and the events that transpired on the video. The court found a "common theme" throughout the case was Father's angry overreaction to various events in the house, e.g., someone disturbing his possessions. Though Father denied acting out, the evidence established the aggressive and threatening nature of his reactions directed to Mother, Nanny, and Son.

The court found Father threatened to spank Son, and actually did spank him for not complying with Father's homework requirements. The court was unsure whether physical discipline would be appropriate under those circumstances but found that threatening Son and causing him anxiety about physical discipline was not appropriate.

The court found Father denigrated and had no respect for Mother, especially concerning Son's education. It was clear from

17

the evidence that Father sought to control every aspect of Son's education given his obvious feeling that Mother was incapable of making any education decisions.  The disdain and its delivery was more than annoying; Mother's peace was disturbed and it made her feel "'less than.'"

The court acknowledged that some of Mother's complaints were more consistent with being annoyed and upset as opposed to having her peace disturbed under the Family Code.  Nevertheless, the court found "there was a consistent undercurrent of control which ran through the parties' relationship."  The court found Father's assertion that he did not get upset with Son when he touched Father's art was not credible given the rest of the evidence.  The court found credible Nanny's testimony that Father threatened her with physical harm for touching his art and Father separately threatened her immigration status.  The court considered these illustrative of the control Father exercised over household members.  The court found Mother's statement that Father had sole control and access to the thermostat and interior and external cameras in fall 2023 credible.

The court noted that Father denied many of the allegations, and "at no time . . . acknowledge[d] or express[ed] remorse for his role in the family and the resulting intense pressure put on [Son]."  The court reflected Father was quick to point out his sacrifice in each situation and put the blame on Mother.  In the mail video and subsequent discussion, Father stated over and over again how many hours he spent with the light bulbs and how disrespectful Mother was.  The court observed that Father denied the August 2023 sexual assault allegation, but texts between the parties make clear some sexual activity occurred—

18

rather than acknowledge even a misunderstanding, Father blamed Mother and responded about his supportive actions.

Based on the evidence, the court found it appropriate to issue a domestic violence restraining order protecting Mother, Son, and Nanny.  The court signed a three-year domestic violence restraining order that continued the existing custody order.  The court acknowledged it was draconian in nature, but it said it did not believe it had sufficient information to make a change—referencing Father's scant acknowledgement of his role in the matter.  The restraining order indicates Mother is the protected person and designates Son and Nanny as other protected people.  The order grants sole legal and physical custody of Son to Mother and authorizes Father to have two telephone calls per week with Son.

Father filed a request for a statement of decision.  The court denied the request, which was filed a day too late, was not in the proper format,[6] and was not accompanied by a copy of the March 5, 2024, transcript that the court referenced in its minute order.

## II.  DISCUSSION

All three of Father's arguments for reversal fail.  The court's comments regarding Father's references to documents and

---

[6]     Specifically, the court said Father's request for a statement of decision took various statements from the court's minute order and repeated them in more than 80 requests, rather than identifying the principal controverted issues at trial and asking the court to explain the factual and legal basis of the court's decision as to each of those issues.

19

videos not produced at trial, and its comments regarding Father's lack of remorse for the effect his role in the family had on Son, do not establish the court improperly shifted the burden of proof to Father. Father has not demonstrated the trial court abused its discretion in denying his continuance requests made primarily because he wanted to take additional discovery. And it was not an abuse of discretion to issue the requested restraining order because substantial evidence establishes Father sexually abused Mother—which means we need not discuss Father's challenges to the other grounds for the order.

### A. The Family Court Did Not Improperly Shift the Burden of Proof

The Domestic Violence Prevention Act (DVPA) authorizes courts to issue a domestic violence restraining order "to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved . . . for a period sufficient to enable these persons to seek a resolution of the causes of the violence," if the evidence shows "reasonable proof of a past act or acts of abuse." (§§ 6220, 6300, subd. (a); *In re Marriage of Evilsizor & Sweeney* (2015) 237 Cal.App.4th 1416, 1424.) The party seeking the order bears the burden of proof. (*Jan F. v. Natalie F.* (2023) 96 Cal.App.5th 583, 593; *Curcio v. Pels* (2020) 47 Cal.App.5th 1, 14.)

Father contends the family court erroneously put the burden of proof on him instead. He points to the family court's comments faulting Father for referencing documentary and video evidence without introducing it at trial and faulting Father for not expressing remorse for his role in the family and its effect on Son.

Evidence Code section 412 provides that "[i]f weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust." (Evid. Code, § 412.) In comments it made after the close of evidence, and in its minute order regarding its ruling, the trial court pointed to Father's comments regarding the ostensible plethora of emails, text messages, and videos in his possession which he indicated would show Mother was not telling the truth and remarked that they were not provided at trial. Father contends this was error primarily because Father was precluded from offering exhibits at trial.

Even if that were true, Father's inability to introduce exhibits at trial was of his own making. Father's attorney did not file an exhibit list by the court-imposed deadline. (See generally Code Civ. Proc., §§ 575.1, 575.2; Super. Ct. L.A. County, Local Rules, rule 5.14.) When Mother's attorney raised the absence of an exhibit list, Father affirmatively stated he was not going to submit one. Then, insofar as the record reveals, Father did not oppose Mother's motion in limine, which asked the court to preclude him from introducing exhibits. Father cannot now complain that the court drew an adverse inference from the absence of exhibits he did not produce when he could have produced them (had he filed an exhibit list) but did not.

Relying on the use notes in CACI 203 and the jury instruction related to Evidence Code section 412, however, Father argues the failure to produce evidence should not be held against a party if there is no evidence the party had the power to produce superior evidence. But Father himself supplied evidence of that power. Father voluntarily referenced the thousands of

21

emails, thousands of pages of text messages, and videos in his possession. He had the power to produce the evidence in discovery. He had the power to identify the evidence on his exhibit list. Yet he could not confirm he did the former, and he did not do the latter.[7]

Father also asserts the court's comments evince a misunderstanding of the reason why he testified about the myriad emails and text messages. As Father argues it, he referenced those emails and texts not because he thought they "disproved the allegations" made by Mother but as examples of how he "felt 'baited' because he believed [Mother] was making a record of things that did not happen." That is too limited a view of the record and Father's testimony. Although Father did mention the emails in the context of stating he felt baited by Mother, his reference to the thousands of text messages and numerous videos were not made in that context. Rather, Father asserted he had videos of Mother pinching Son, flicking him in the head, and screaming at him in the context of explaining conversations he and Mother had about disciplining Son. And he asserted he had 2,400 pages of text messages that showed the consistency of his relationship with Mother. None of that was introduced in evidence (or apparently produced in discovery), the

---

[7] Father's complaint that the trial court did not direct similar comments to Mother lacks merit. Father seemingly contends that because Mother had access to and preserved some video recordings, she should have preserved or produced more videos, and the court should have faulted her for not doing so. But Mother testified she provided everything she could find or remember and had not sought to preserve other videos. Father, in contrast, referenced videos he did not believe he had produced.

family court drew an adverse credibility inference on that basis, and drawing that adverse credibility inference was not an improper shift in the burden of proof.

Father also argues the trial court placed an undue burden on him by remarking that Father did not acknowledge or express remorse. The record does not support Father's assertion that the trial court improperly placed the burden of proof on him by making these comments.

The comments Father highlights come in the family court's minute order; the court writes "there was scant acknowledgment by [Father] of his role in this matter," and that, "at no time did [Father] acknowledge or express remorse for his role in the family and the resulting intense pressure put on [Son]." The court further stated that "[t]ypically, [Father] was quick to point out his sacrifice in each situation and put the blame on [Mother]." The court then went on to discuss two examples of video and documentary evidence that featured Father acting in such a manner. The first was the mail video and subsequent video in the den, where Father focused on how many hours he spent with the lightbulbs, and how disrespectful Mother was. The second was the text message chain between Father and Mother regarding the sexual assault in August 2023, from which it is clear some sexual activity occurred, but in which Father does not even acknowledge a misunderstanding and instead blames Mother for everything.

The context for the court's observations reveals the family court never said or intimated that Father should have expressed remorse during the evidentiary hearing. Instead, it pointed out a pattern of behavior it observed from the evidence, namely, that Father did not recognize his role in events as they occurred.

Additionally, the court remarked only that Father did not demonstrate remorse for his role in the family and resulting pressure on Son, not that he did not express remorse for any alleged wrongdoing.

In a summary fashion, Father combines a laundry list of additional wrongs he contends the trial court committed, which he asserts indicates the court assumed a position of advocacy against him. The law Father cites cautioning against assuming such a position of advocacy, however, addresses the propriety of the way a trial court questions a witness in a jury trial. (See, e.g., *Bailey v. Murray* (2024) 102 Cal.App.5th 677, 685 [stating a court has the discretion and duty to ask questions of witnesses to elicit material facts or clarify confusing testimony, and noting the questioning "'must not convey to the jury the court's opinion of the witness's credibility'"].) Here, of course, there was no jury—the court itself was the factfinder. And Father identifies no questions posed by the trial court that he contends were improper.

Father also takes issue with the court's decision to quote section 6309's statement that "[d]omestic violence survivors who enter the family or civil court systems seeking protection often face ongoing abuse in the form of litigation abuse." (§ 6309, subd. (a)(1)(C).) We fail to see how the court's reading of a statutory provision after the close of testimony rendered the hearing unfair where, as here, there was no jury for the court to bias and the court, of course, is presumed to know the applicable law.

Father also asserts the court assumed a position of advocacy by cutting short a line of questioning regarding "an education issue" and making adverse findings against Father involving the issue of education. The testimony in question

24

involved a workbook Son was given by his school and Mother and Father's related communications with his teachers. After Mother testified she did not believe Father communicating with the school regarding the workbook was abusive, Father continued asking Mother questions on the topic. It was at that point the court interjected and indicated Father should move on. Father does not identify which of the education-related findings were germane to the line of questioning the court truncated. Without such an identification, or even a contemporaneous objection, the argument fails. (Evid. Code, § 354; *Steven W. v. Matthew S.* (1995) 33 Cal.App.4th 1108, 1117.)

> B.  *The Trial Court Did Not Abuse Its Discretion by Denying Father's Continuance Requests*

In a DVPA proceeding, "[t]he respondent shall be entitled, as a matter of course, to one continuance for a reasonable period, to respond to the petition." (§ 245, subd. (a).) Additionally, "[e]ither party may request a continuance of the hearing, which the court shall grant on a showing of good cause." (§ 245, subd. (b).)

The trial court denied both of the ex parte continuance requests that Father filed in February 2024 (two of the three continuances Father requested in total). Because trial courts enjoy "broad discretion in deciding whether to grant a request for a continuance" (*Freeman v. Sullivant* (2011) 192 Cal.App.4th 523, 527), we review the denial of a continuance for an abuse of that

discretion (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 823).[8]

The court's stated reason for denying Father's early February request for a continuance was that an ex parte application was not appropriate in light of section 6309. Section 6309 provides that a party to a domestic violence restraining order matter is not permitted to conduct discovery under the Civil Discovery Act unless the party makes a showing of good cause. (§ 6309, subds. (b), (c)(1).) The statute further provides that "[a] party may make an oral or written request for discovery to the court at an evidentiary hearing pursuant to this part." (§ 6309, subd. (c)(2).)

Section 6309 became effective January 1, 2024. It was thus not effective when Father began discovery, but it was effective when he requested his continuance on the ground that he needed additional time to complete discovery. In his ex parte request for a continuance, Father did not request discovery under section 6309 or attempt to establish good cause for the discovery he stated he needed to complete. Though, as Father contends, the statute does not expressly prohibit a party from making a request for discovery on an ex parte basis, it was not an abuse of the court's discretion to deny the request because Father did not comply with the statute.

---

[8] To the extent Father complains about the cumulative effect of precluding him from presenting exhibits at trial and denying his continuance requests, the argument is meritless because, for reasons already discussed, the issuance of the evidentiary order was due to Father's decision not to submit an exhibit list.

26

In denying Father's subsequent ex parte application for a continuance, the trial court said the hearing dates had been set for almost 90 days, the temporary restraining order had been in place for four months, both parties were entitled to resolution of the issues, and from the court's review of the papers there was not good cause to continue the matter virtually on the eve of trial. A hearing on a request for a domestic violence restraining order is an expedited proceeding required to be heard, in the normal course, 21 to 25 days from when the petition is filed. (§ 242.) The evidentiary hearing was scheduled to begin (and did begin) 132 days after Mother filed her request for a restraining order. It was well within the trial court's discretion to determine granting Father additional time was not warranted.

Father contends the denial of his requests for continuance deprived him of the ability to present his case on the merits, pointing to the many segments of the October 2023 video Mother presented and asserting forensic analysis would have been appropriate and reasonable under the circumstances. But Father does not show he could not have undertaken this sort of forensic analysis between the time of production and the commencement of trial: the October 2023 video to which he points consisted of 10 separate videos, but the longest was only two minutes and nine seconds long, and most were under 30 seconds long. Father also argues (though he did not so argue below) that forensic analysis would have been appropriate in light of his testimony that there were gaps in the clips. But Father's testimony established those very gaps, and Father does not explain what forensic confirmation of the gaps would have added.

Father further contends his requests to continue the hearing were based on good faith efforts to understand the nature

27

and scope of the allegations against him and in consideration of the availability of counsel.  Father had four months to understand the nature of the allegations against him and to obtain discovery.  That should have been ample time.  Indeed, in his first request for a continuance he sought "at least 90 days," and he received 109 days after making the request.  Father also asserts he sought the continuance due to the availability of his counsel, but Father was represented by two attorneys at the evidentiary hearing, at least one of whom had represented Father since early November 2023.  Father has accordingly not demonstrated the trial court abused its discretion in determining there was no good cause for the continuance.

### C.    *The Family Court's Ruling Was Not an Abuse of Discretion*

The DVPA defines abuse to include physical violence or the threat thereof, including sexual assault, as well as disturbing the peace of the other party.  (§ 6203, subds. (a)(1)-(4); § 6320, subd. (a); see *In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1494, 1497.)  "'[D]isturbing the peace of the other party' refers to conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party," including by exercising coercive control.  (§ 6320, subd. (c).)

We review an order granting a protective order under the DVPA for abuse of discretion.  (*Nadkarni, supra,* 173 Cal.App.4th at 1495.)  "[T]o the extent we are called upon to review the court's factual findings, we apply the substantial evidence standard of review."  (*Curcio, supra,* 47 Cal.App.5th at 12.)  We accept as true all evidence tending to establish the correctness of the trial court's findings and resolve every conflict in favor of the

28

judgment.  (*Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1143.)

Father contends the trial court prejudicially erred in finding abuse under the DVPA because the evidence admitted does not rise to the level of abuse.  Specifically, Father argues substantial evidence did not support a finding of abuse based on corporal punishment of Son, the evidence did not support the finding of "coercive" control, the court improperly ignored the totality of the circumstances in determining Father disturbed Mother's peace, and Father's right to defend his property meant any injury inflicted when he acted in defense of that property could not constitute abuse.

We will assume just for argument's sake that all of that is correct even though the family court expressly found Mother more credible than Father about the various events and we would accord deference to that finding.  (See, e.g., *Cohen v. TNP 2008 Participating Notes Program, LLC* (2019) 31 Cal.App.5th 840, 859.)  There is still a proper basis for the court's discretionary decision to issue the restraining order because Mother testified that Father sexually abused her multiple times over the course of their relationship, including by refusing to take "no" for an answer, at least once by physically pinning her down and thrusting his penis into her mouth, and by penetrating her with his fingers while she was asleep in August 2023.[9]  This testimony

---

[9]      The trial court did not emphasize the sexual abuse testimony in its minute order ruling, but it did remark on the record after the close of evidence that it believed there was "pretty good evidence . . . that the event that [Mother] testified [to] actually probably occurred the way she said it did."

29

(unchallenged by Father on sufficiency of the evidence grounds) is alone adequate to justify issuance of the order.  (See generally *J.M. v. G.H.* (2014) 228 Cal.App.4th 925, 935 ["We draw all reasonable inferences in support of the court's ruling and defer to the court's express or implied findings when supported by substantial evidence"].)

## DISPOSITION

The family court's order is affirmed.  Mother is awarded costs on appeal.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, Acting P. J.

We concur:



MOOR, J.



KIM (D.), J.